In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3548

RICHARD E. CRAYTON,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 13-cv-552-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED JANUARY 22, 2015 — DECIDED JUNE 25, 2015

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge. Apprendi v. New Jersey*, 530 U.S. 466 (2000), holds that facts increasing a criminal defendant's maximum permissible sentence must be established, beyond a reasonable doubt, to the satisfaction of the trier of fact (a jury unless the defendant agrees to a bench trial or formally admits the facts). *Harris v. United States*, 536 U.S. 545 (2002), holds that facts increasing the minimum permis-

sible sentence may be found by a judge on the preponderance of the evidence. But *Alleyne v. United States*, 133 S. Ct. 2151 (2013), overrules *Harris* and holds that facts controlling both minimum and maximum sentences are in the jury's province and covered by the reasonable-doubt standard. Richard Crayton, whose sentence became final between *Harris* and *Alleyne*, contends that *Alleyne*'s rule applies retroactively on collateral review.

A jury convicted Crayton of distributing heroin. The indictment alleged that Nicole Hedges died from using Crayton's product, which if true would increase the minimum sentence (though not constitute a new offense), but the jury could not decide unanimously whether Hedges's death resulted from Crayton's heroin. The district judge then found that it did. Under 21 U.S.C. §841(b)(1)(C) this required the sentence to be at least 20 years' imprisonment, and that's what the district judge imposed. In the absence of the finding that Crayton's heroin killed Hedges, the statutory range would have been 0 to 20 years. The judge stated that she thought the statutory floor excessive, but she concluded that the law required her to sentence Crayton to 20 years in prison. This court affirmed. *United States v. Crayton*, No. 11-1820 (7th Cir. Dec. 27, 2011) (nonprecedential disposition).

Five months after denying Crayton's petition for certiorari, 132 S. Ct. 2379 (2012), the Supreme Court granted Alleyne's. 133 S. Ct. 420 (2012). While Alleyne's case was pending, Crayton filed a petition under 28 U.S.C. §2255. The district court dismissed it without prejudice while waiting for *Alleyne*—an improper procedure given the time-and-number limits in §2255, see *Rhines v. Weber*, 544 U.S. 269 (2005); *Purvis v. United States*, 662 F.3d 939 (7th Cir. 2011), though nei-

ther side protested. When Crayton filed another after the Supreme Court issued its decision, the district court held that *Alleyne* does not apply retroactively on collateral review. (The parties treat Crayton's current §2255 filing as an initial petition, and as timely, despite the district court's misstep in dismissing Crayton's first petition.)

Every court of appeals that has considered the subject has concluded that *Alleyne* is not retroactive on collateral review. *Butterworth v. United States*, 775 F.3d 459 (1st Cir. 2015); *United States v. Reyes*, 755 F.3d 210, 212–13 (3d Cir. 2014); *United States v. Olvera*, 775 F.3d 726 (5th Cir. 2015); *Jeanty v. Warden, FCI-Miami*, 757 F.3d 1283, 1285–86 (11th Cir. 2014). Two other circuits have said the same thing in nonprecedential opinions. *Rogers v. United States*, 561 F. App'x 440, 443–44 (6th Cir. 2014); *United States v. Richards*, 567 F. App'x 591, 593 (10th Cir. 2014) (based on *In re Payne*, 733 F.3d 1027 (10th Cir. 2013), which addressed §2255(h)(2)). Our circuit held in *Simpson v. United States*, 721 F.3d 875 (7th Cir. 2013), that *Alleyne* does not authorize a second or successive collateral attack under §2255(h)(2) because only the Supreme Court can declare a decision retroactive for the purpose of that paragraph. *Tyler v. Cain*, 533 U.S. 656 (2001). But for an initial petition, such as Crayton's, a district judge or court of appeals may make the retroactivity decision, and that's what Crayton asks us to do. But we conclude that the other circuits are correct. *Alleyne* does not apply retroactively.

*Alleyne* extends *Apprendi* from maximum to minimum sentences. Only once has the Supreme Court considered whether a decision that rests on *Apprendi* applies retroactively on collateral review. It held in *Schriro v. Summerlin*, 542 U.S. 348 (2004), that *Ring v. Arizona*, 536 U.S. 584 (2002), is

not retroactive. Crayton maintains that *Schriro* is not disposi-
tive against him, because *Ring* applied *Apprendi* to change
(from judge to jury) the identity of the decisionmaker under
one state's procedure for capital punishment but did not af-
fect that state's allocation of the burden of persuasion (the
state had used the reasonable-doubt standard all along).
Crayton contends that a decision changing the burden of
persuasion, as *Alleyne* did, is entitled to retroactive applica-
tion under the criteria of *Teague v. Lane*, 489 U.S. 288 (1989).

The problem with that argument is that *Apprendi* itself
changed both the identity of the decisionmaker and the bur-
den of persuasion, but the Supreme Court has not declared
*Apprendi* to be retroactive—nor has any court of appeals. We
held in *Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002),
that *Apprendi* is not retroactive under the *Teague* standard.
We concluded that two sorts of decisions are applied retro-
actively: those holding that the law does not (or cannot con-
stitutionally) make particular conduct criminal, and those
identifying rights "so fundamental that any system of or-
dered liberty is obliged to include them." *Curtis*, 294 F.3d at
843. And we held that the changes made by *Apprendi* are not
in the latter category (no one thinks them to be in the "inno-
cence" category).

Throughout this nation's history judges have based sen-
tences on findings made by a preponderance of the evi-
dence. *Harris* held that *Apprendi* had altered this approach
only for maximum sentences; *Alleyne* disagreed and held
that *Apprendi* logically implies using the jury (and the rea-
sonable-doubt standard) for minimum sentences too. But
neither *Apprendi* nor *Alleyne* concluded that findings on the
preponderance standard are too unreliable in general to be

the basis of a valid sentence. Judges routinely make findings, based on a preponderance of the evidence, that dramatically affect the length of criminal sentences.

Consider: even if Crayton's trial had occurred after *Alleyne*, and the jury had found unanimously that Crayton's heroin did not kill Hedges, the judge still would have been entitled to sentence Crayton to 20 years in prison for distributing heroin after finding by a preponderance of the evidence that his product did kill Hedges. See *United States v. Watts*, 519 U.S. 148 (1997). *Alleyne* did not overrule *Watts* or recognize a fundamental principle that sentences must rest on findings supported by proof beyond a reasonable doubt. Instead *Alleyne* curtails legislatures' ability to restrict judicial discretion in sentencing. A legislature that wants to impose compulsory minimum sentences must submit the discretion-reducing facts to the jury under the reasonable-doubt standard. That principle is some distance from a rule that defendants are entitled to have all important facts resolved by the jury under the reasonable-doubt standard.

It is lawful today for a judge to increase a sentence based on facts found on the preponderance standard. "Findings by federal district judges are adequate to make reliable decisions about punishment. See *Edwards v. United States*, 523 U.S. 511 (1998)." *Curtis*, 294 F.3d at 844. It follows, as we held in *Curtis* about *Apprendi* itself, that *Alleyne* is not so fundamental that it must apply retroactively on collateral review.

Crayton contends that *Alleyne* should be applied retroactively to his case, even if not to other prisoners' cases, because the district judge made it clear that she would not have given him a 20-year sentence but for her belief (correct at the time of sentencing, given *Harris*) that a minimum sen-

tence may be increased by judicial findings. That is to say, in the post-*Alleyne* world the judge still would have found by a preponderance of the evidence that Crayton's heroin killed Hedges, but the sentence would have been under 20 years. But all this does is show that *Alleyne* would have affected the outcome, had the decision been rendered earlier; it does nothing to change the standard for retroactivity. Under *Teague* decisions apply retroactively, or they do not; the Supreme Court has never suggested that new procedural rules apply retroactively to some petitioners but not others.

AFFIRMED

WILLIAMS, *Circuit Judge*, concurring. I am not sure whether the Supreme Court would find *Alleyne* to be retroactively applicable on collateral review. But because we as appellate courts decide the retroactivity question in the first instance, absent direction from the Supreme Court, *Ashley v. United States*, 266 F.3d 671, 673 (7th Cir. 2001), I would like to weigh in on both the arguments for retroactivity and the Supreme Court's jurisprudence on the topic. I also take issue with the majority's reliance on the non-retroactivity of an earlier case. That is not dispositive.

The majority states that if "Nicole Hedges died from using Crayton's product," that finding would increase the minimum sentence but would "not constitute a new offense." Slip op. 2.[1] Under *Alleyne*, that is simply not true. *Alleyne* made clear that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a *new offense*." 133 S. Ct. at 2162 (emphasis added). "Distribution of heroin" is not the same offense as "distribution of heroin that results in death." We know that they are not the same offense but instead constitute two different offenses because the statutes provide for different statutory ranges of punishment. *See* 21 U.S.C. § 841(b)(1)(C).

This misconception has permeated circuit court decisions addressing whether *Apprendi* and *Alleyne* should apply retroactively, leading many courts to downplay the significance of these decisions. *See, e.g.*, *Sepulveda v. United States*, 330 F.3d 55, 60 (1st Cir. 2003) ("Nothing in the

---

[1] Perhaps this statement is a reference to the pre-*Alleyne* understanding of conviction versus sentencing, but later portions of the opinion, see slip op. 4–5, suggest otherwise.

*Apprendi* decision indicates to us that infringements of its rule will seriously diminish the accuracy of convictions (which, by definition, must take place before any such infringement occurs)."); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 671 (9th Cir. 2002) ("The application of *Apprendi* only affects the enhancement of a defendant's sentence once he or she has already been convicted beyond a reasonable doubt."); *Goode v. United States*, 305 F.3d 378, 385 (6th Cir. 2002) ("The accuracy that is improved by the *Apprendi* requirement is in the better imposition of a proper sentence. In contrast, the accuracy that is improved by the rule of *Gideon* involves the basic determination of the defendant's guilt or innocence."). I cannot subscribe to this view. First, *Apprendi* and *Alleyne* are not about sentencing. They are about the accurate determination of a defendant's guilt of a particular offense. If *Apprendi* was not clear on this point, *Alleyne* clarified it. 133 S. Ct. at 2160 (stating that "because the legally prescribed range is the penalty affixed to [a] crime," a fact that increases either end of the penalty range "produces a new penalty and constitutes an ingredient of the offense"). Second, that we, along with other circuits, found *Apprendi* to not be retroactive is not dispositive of the question of whether *Alleyne* is retroactive. One reason we know that is because the Supreme Court has told us that *Gideon v. Wainwright* would be retroactive, *Saffle v. Parks*, 494 U.S. 484, 495 (1990), without indicating that any of *Gideon*'s antecedents—like *Johnson v. Zerbst*, 304 U.S. 458 (1938) or *Powell v. Alabama*, 287 U.S. 45 (1932)—would be retroactive.

I begin with a discussion of the Supreme Court's retroactivity jurisprudence, which the majority does not address. The only part of the majority's opinion that appears to reference any court's standard for retroactivity is a citation

to our own decision in *Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002). Slip op. 4. The standard from the Supreme Court is that procedural rules must be "implicit in the concept of ordered liberty" (among other things) in order to be retroactively applicable. *Teague v. Lane*, 489 U.S. 288, 307 (1989). However, *Curtis* framed the question as whether the rules are "so fundamental that *any system* of ordered liberty is obliged to include them." 294 F.3d at 843 (emphasis added). The majority repeats this language from *Curtis*. The difference in phrasing may seem small, but the Supreme Court has indicated that a rule need not be utilized by every criminal justice system in order to be implicit in the concept of ordered liberty in the United States. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.").

Under *Teague*, a new rule can be retroactive to cases on collateral review only if it falls into one of two narrow exceptions to the general rule of nonretroactivity. 489 U.S. at 311–13. Of relevance here is the second *Teague* exception for new rules of criminal procedure. New rules of procedure generally do not apply retroactively to cases that became final before the new rule was announced, unless the new rule is "a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 549 U.S. 406, 416 (2007). To qualify as watershed, a new rule must meet two requirements. "Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a

proceeding." *Tyler v. Cain*, 533 U.S. 656, 665 (2001). In my view, *Alleyne* meets these requirements.

*Alleyne* applied a fundamental principle that dates back at least to our nation's founding. It has long been established that the Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). This right to be convicted beyond a reasonable doubt is a "historically grounded right[] of our system, developed to safeguard men from dubious and unjust convictions." *Brinegar v. United States*, 338 U.S. 160, 174 (1949). That the government must prove beyond a reasonable doubt every element of an offense is "an ancient and honored aspect of our criminal justice system." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

The reasonable-doubt standard "plays a vital role in the American scheme of criminal procedure." *Cage v. Louisiana*, 498 U.S. 39, 39–40 (1990) (quoting *Winship*, 397 U.S. at 363). "Among other things, it is a prime instrument for reducing the risk of convictions resting on factual error." *Cage*, 498 U.S. at 40. The reasonable-doubt standard implicates the fundamental fairness and accuracy of criminal proceedings because "a person accused of a crime would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case." *Winship*, 397 U.S. at 363. "[U]se of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of

proof that leaves people in doubt whether innocent men are being condemned." *Id.* at 364. In fact, the Supreme Court has said that the reasonable-doubt requirement is a basic protection "without which a criminal trial cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).

The requirement that every element of a crime—defined as every fact that changes the statutory penalty range, *Alleyne*, 133 S. Ct. at 2158—be proven beyond a reasonable doubt improves the accuracy of the fact-finding process, because it reduces the risk that a person guilty of one crime might be convicted of a more serious, and separate, crime of which he is innocent. In fact, the reasonable-doubt standard is the "prime instrument" for reducing such risk. *Cage*, 498 U.S. at 40. In my view, the "beyond a reasonable doubt" standard for a criminal conviction goes to the heart of fundamental fairness and accuracy and lowering the standard for a criminal conviction to "preponderance of the evidence" increases the risk of an inaccurate conviction. Factfinding based upon preponderance of the evidence, rather than the reasonable-doubt standard, seriously diminishes accuracy such that there is an impermissibly large risk of an inaccurate conviction.

As to the second requirement for a watershed rule, *Alleyne* altered our understanding of the bedrock procedural elements essential to the fairness of a proceeding by establishing a new class of facts that constitute the "crime" and thus must be found by the jury beyond a reasonable doubt. We have long known that elements of the crime must be proven beyond a reasonable doubt. But there has been much debate about how to define "elements" versus

"sentencing factors." *Alleyne* changed our understanding of what constitutes an "element" of a crime. "Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 232 (1999).

Allowing Crayton to be convicted of "distribution of heroin that resulted in death" by a mere preponderance of the evidence increased the risk of his conviction resting on a factual error. The reasonable-doubt standard "provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Winship*, 397 U.S. at 363. Failing to apply *Alleyne* (and *Apprendi*) retroactively creates the "troubling possibility that a defendant has been convicted of conduct that constitutes a less serious offense than the one for which he is sentenced." *Coleman v. United States*, 329 F.3d 77, 93 (2d Cir. 2003) (Parker, Jr., J., concurring in the judgment). Many judges seem untroubled by this possibility. I am not one of them. I do not think the fact that a person is guilty of one crime means that he has a lesser interest in, or right to, a determination of his guilt of a different offense beyond a reasonable doubt.

Two Supreme Court decisions suggest that new rules which implicate the reasonable-doubt standard like *Alleyne* should be applied retroactively. In *In re Winship*, the Supreme Court stated "[l]est there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. In *Ivan V. v. City of New York*, 407 U.S. 203 (1972), a pre-*Teague* case, the Court unanimously made *In re Winship* retroactively applicable on collateral review. In *Hankerson v. North Carolina*, 432 U.S. 233 (1977), another pre-*Teague* case, the Court (again unanimously) found that *Mullaney v. Wilbur*, 421 U.S. 684 (1975)—which established the rule that the state must establish all elements of a criminal offense beyond reasonable doubt and invalidated presumptions that shift the burden of proving elements to the defendant—was retroactively applicable.

The majority writes that neither *Apprendi* nor *Alleyne* concluded that findings based on the preponderance standard are too unreliable in general to be the basis of a valid *sentence.* I do not quarrel with that statement. My quarrel is with the characterization of *Alleyne* as a decision about sentencing, rather than guilt. "Each crime has different elements and a defendant can be convicted only if the jury has found each element of the crime of conviction." *Alleyne*, 133 S. Ct. at 2162. The fundamental question here is guilty or not guilty *of what*? Crayton was found guilty of "distribution of heroin" beyond a reasonable doubt. But he was not found guilty of "distribution of heroin that resulted in death" beyond a reasonable doubt. These are two different offenses. As the Supreme Court said in *Alleyne*, "the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury" and proven beyond a reasonable doubt. *Id.* at 2161. Facts that increase a mandatory statutory minimum are "part of the substantive

offense." *Id.* "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense." *Id.* at 2162. The accuracy improved by *Alleyne* is not just in the proper sentence. It is in the determination of guilt or innocence with respect to the offense of distribution of heroin that resulted in death.

While the majority mentions *Schriro v. Summerlin*, 542 U.S. 348 (2004), the holding of that case is of little assistance in deciding the question here since *Schriro* was about jury versus judicial fact finding where critically, the standard of proof of beyond a reasonable doubt remained unchanged. Furthermore, even if *Alleyne* was about sentencing, *Schriro* "leaves little doubt that the 'watershed rule' can apply to a procedural rule that only affects sentencing." *Lloyd v. United States*, 407 F.3d 608, 614 (3d Cir. 2005). We must look at whether factfinding based upon a preponderance of the evidence "so *seriously* diminishes accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Schriro*, 542 U.S. at 355–56. That it does. Because the reasonable-doubt standard is the prime instrument to ensure accuracy of convictions, allowing a factfinder to make determinations based upon a preponderance of the evidence, rather than beyond a reasonable doubt, does seriously diminish accuracy.

The majority also writes that post-*Alleyne*, "the judge still would have been entitled to sentence Crayton to 20 years in prison for distributing heroin after finding by a preponderance of the evidence that his product did kill Hedges," citing generally *United States v. Watts*, 519 U.S. 148 (1997). Slip op. 5. However, being entitled to do something

and being required to do something are two very different things. And the argument is a red herring because the judge was entitled to sentence Crayton to 20 years *with or without* a finding that his product resulted in death. After all, the statutory range for "distribution of heroin" was 0 to 20 years. She clearly did not want to sentence Crayton so high, but she was *bound* to, based upon a finding by a preponderance of the evidence that death resulted. Ironically, the judge could not have sentenced Crayton to 241 months (20 years and 1 month), because that sentence would have violated *Apprendi*. The preponderance of the evidence finding required her to sentence Crayton to exactly 20 years.

The majority further writes that "[t]hat principle" (which I assume is a reference to the holding of *Alleyne*) "is some distance from a rule that defendants are entitled to have all important facts resolved by the jury under the reasonable-doubt standard." Slip op. 5. I am not sure what it means by the concept of "important facts." But the rule of *Alleyne* is that defendants are entitled to have all facts that increase a statutory minimum or maximum resolved by a jury under the reasonable doubt standard. So if by "important facts" it means "facts that increase a statutory minimum or maximum," it is wrong.

Having considered the importance of the "beyond a reasonable doubt" standard and the ways in which *Alleyne* altered our understanding of this bedrock procedural element, I now address what is pragmatically the real problem: the fact that the Supreme Court has never found a new rule of criminal procedure to fall within the second *Teague* exception. It has come close though. On more than one occasion, the Court has been one justice shy of finding

new rules of criminal procedure to be retroactively applicable. *See, e.g., Schriro v. Summerlin*, 542 U.S. 348 (2004); *O'Dell v. Netherland*, 521 U.S. 151 (1997); *Sawyer v. Smith*, 497 U.S. 227 (1990); *see also Tyler v. Cain*, 533 U.S. 656 (2001) (one justice shy of finding that the Court had already made *Cage* retroactive in *Sullivan*).

What the Court said is that *Gideon* would be such a rule, *Saffle*, 494 U.S. at 495, and so I turn to *Gideon* for guidance. *See Gray v. Netherland*, 518 U.S. 152, 170 (1996) (referring to the *Gideon* rule as a "paradigmatic example" of the second *Teague* exception).

With the passage of time, I hope we do not lose sight of the context in which *Gideon* was decided. *Gideon* was remarkable. But its holding did not come out of nowhere. Some courts have described *Gideon* as cutting "a new rule from whole cloth," *see Butterworth v. United States*, 775 F.3d 459, 468 (1st Cir. 2015), unlike *Apprendi* and *Alleyne*, but I disagree. A series of other decisions regarding the right to counsel, due process, and incorporation of the Bill of Rights to the states led to it—decisions which the Supreme Court has not suggested would have met the standard for the watershed rule exception under *Teague*. Prior to *Gideon*, the Supreme Court had determined that the Sixth Amendment required counsel to be provided to indigent federal defendants. *Johnson v. Zerbst*, 304 U.S. 458 (1938). It had also found that the Due Process Clause required states to provide counsel to indigent defendants in special circumstances, *Powell v. Alabama*, 287 U.S. 45 (1932), which eventually came to include all capital cases, *Hamilton v. Alabama*, 368 U.S. 52 (1961), but also encompassed non-capital cases where the totality of facts showed circumstances requiring

appointment of counsel like the personal characteristics or complexity of the charge made a fair trial unlikely without appointed counsel, *e.g.*, *Betts v. Brady*, 316 U.S. 455 (1942).[2] The Court had established that it violated due process for a state to deny a defendant the opportunity to obtain (and the right to be represented by) counsel of one's own choosing. *Chandler v. Fretag*, 348 U.S. 3, 9 (1954). And it had made other Bill of Rights guarantees obligatory on the states through the Fourteenth Amendment, including the Fourth Amendment's prohibition on unreasonable searches and seizures and the Eighth Amendment's ban on cruel and unusual punishment. *Gideon*, 372 U.S. at 342.

Given these precedent cases, it is no wonder that Justice Clark in his concurrence in *Gideon* noted that that case "d[id] no more than erase a distinction which ha[d] no basis in logic and an increasingly eroded basis in authority." *Gideon*, 372 U.S. at 348 (Clark, J., concurring in the result). That sounds familiar. *See Alleyne*, 133 S. Ct. at 2160 (citing Justice Breyer's concurrence in *Harris v. United States*, 536 U.S. 545 (2002), which reasoned that facts increasing the minimum and facts increasing the maximum cannot be distinguished "'in terms of logic'").

Some circuits have found that "*Gideon* altered our understanding of what constitutes basic due process by

---

[2] This particular rule—that states must provide counsel to indigent non-capital defendants under special circumstances—produced a long series of Supreme Court decisions, most of which found that the defendant was entitled to appointed representation under the circumstances. *See Moore v. Michigan*, 355 U.S. 155, 159 n.7 (1957) (citing twenty-six Supreme Court cases discussing the principles which determine the extent to which the constitutional right to counsel is secured in a state prosecution).

establishing that representation by counsel is fundamental to a fair trial," while *Apprendi* and *Alleyne* "merely clarified and extended the scope of a pre-existing right—the right to have all convictions supported by proof beyond a reasonable doubt." *United States v. Mora*, 293 F.3d 1213, 1219 (10th Cir. 2002). I cannot help but sense some revisionist history. Prior to *Gideon*, *Powell* had already stated that the right to counsel was fundamental. 287 U.S. at 68. *Gideon* merely clarified and extended the scope of a pre-existing right because the right to counsel previously existed in federal prosecutions, special circumstances, and state inmates prosecuted for capital offenses.

The Supreme Court and circuit courts alike have found that new procedural rules, despite arguably being aimed at improving the accuracy of trial or promoting the objectives of fairness and accuracy, do not meet the *Teague* standard because they are not as "sweeping" as *Gideon*. *See e.g.*, *O'Dell*, 521 U.S. at 167; *United States v. Mandanici*, 205 F.3d 519, 528–29 (2d Cir. 2000). It seems to me that the "sweeping" nature of *Gideon* is not so much a reflection of how many cases it would have applied to retroactively, but instead a statement about how many cases in which it would be a relevant consideration going forward. The Supreme Court said that *Gideon* was sweeping because it "established an affirmative right to counsel in all felony cases." *O'Dell*, 521 U.S. at 167. But the right to counsel had already been established for all federal defendants and for state defendants under certain circumstances. Also, because of *Johnson* and the fact that most states provided counsel to indigent defendants as a matter of state law prior to *Gideon*, relatively few defendants actually needed to be retried as a result of *Gideon*'s holding. Most indigent defendants were already being provided with

counsel prior to *Gideon*.[3] But going forward, an assertion of the federal constitutional right to counsel became a factor in every criminal case. Similarly, many rules have been found to be not as "sweeping" as *Gideon* because they simply are not a factor in a significant number of cases. For example, the rule from *Crawford v. Washington*, 541 U.S. 36 (2004) is only a consideration where the government seeks to admit testimonial hearsay. *Whorton*, 549 U.S. at 419; s*ee also O'Dell*, 521 U.S. at 167 (right of rebuttal afforded to defendants in a "limited class of capital cases" was not as "sweeping" as *Gideon*). That just does not come up in every criminal case. But how to define the crime (the issue in *Alleyne*) does. It is just as sweeping as *Gideon*.

In many ways, *Alleyne* is similar to *Gideon* in that it is the culminating case in a long-running debate regarding a fundamental right. *Gideon* settled the debate of when our Constitution requires that the government provide counsel to indigent defendants. *Alleyne* settled the debate of how a "crime" is defined. Each crime is composed of different elements and a fact is an element of a crime when it alters the legally prescribed punishment. 133 S. Ct. at 2162. It cannot be a sufficient justification that *Alleyne* is not

---

[3] Even prior to *Johnson*, in 1930, the Supreme Court noted that "[t]hanks to the humane policy of the modern criminal law", a criminal defendant "may have counsel furnished him by the state." *Patton v. United States*, 281 U.S. 276, 308 (1930). In 1955, at least thirty-four states provided counsel to indigent defendants in all felony prosecutions. William M. Beaney, THE RIGHT TO COUNSEL IN AMERICAN COURTS 84–85 (1955). In fact, "by the time *Gideon* was decided, only five states had a definite policy against appointing counsel in noncapital cases." William M. Beaney, *The Right to Counsel: Past, Present, and Future*, 49 Va. L. Rev. 1150, 1156 (1963).

retroactive because it has close analytic ties to *Apprendi* (which is not retroactive), because *Gideon* meets the *Teague* standard, but the Supreme Court has not suggested that *Johnson* or *Powell*, to which *Gideon* has close analytic ties, would also meet the *Teague* standard. *Apprendi* does not need to be retroactive in order for *Alleyne* to be retroactive.

Obviously, applying *Alleyne* retroactively would mean that the holding of *Apprendi* would be applied retroactively as well. But the same is true of *Gideon* and its predecessors. Applying *Gideon* retroactively necessarily entails that the holdings of *Johnson* and *Powell* are applied retroactively. A rule that counsel must be provided to all indigent defendants in felony prosecutions subsumes the rule that counsel must be provided to indigent state defendants in special circumstances.

Here, the district judge was permitted to convict Crayton of "distribution of heroin that resulted in death" in the in-between range of equal to or greater than a preponderance of the evidence, but less than beyond a reasonable doubt. While the district court did not state that she would not have found death resulting beyond a reasonable doubt, the government said at oral argument that if the judge had said on the record that she found that death resulted by a preponderance and also explicitly said she did not find it beyond a reasonable doubt, the government's position would be the same. Many cases have tried and failed to have new procedural rules declared retroactive by the Supreme Court. But in my opinion, none of these rules were as essential to ordered liberty as the rule that criminal defendants must be convicted beyond a reasonable doubt.

All that said, I recognize that the Supreme Court has never found a new rule of criminal procedure to meet the *Teague* standard, so I concur in the judgment here. However I hope that the Supreme Court will find in its retroactivity jurisprudence space on the *Gideon* pedestal for other new rules, particularly those so important to our criminal justice system as the reasonable-doubt standard.